IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL KILGORE, | ) | Case No. 5:25-cv-02530-RJS |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | REUBEN J. SHEPERD |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

## I. Introduction

Plaintiff, Michael Kilgore, ("Kilgore"), seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") failed to reach a conclusion supported by substantial evidence, I vacate the Commissioner's final decision denying Kilgore's applications for DIB and SSI and remand his case to the Agency for further consideration.

## II. Procedural History

Kilgore filed for DIB and SSI on June 16, 2023, alleging a disability onset date of April 9, 2020. (Tr. 408-14, 436-37). The claims were denied initially and on reconsideration. (Tr. 314-30; 337-48). He then requested a hearing before an ALJ. (Tr. 373-74). Kilgore (represented by counsel) and a vocational expert ("VE") testified before the ALJ on October 3, 2024. (Tr. 257-

93). On November 4, 2024, the ALJ issued a written decision finding Kilgore not disabled. (Tr. 241-51). The Appeals Council denied his request for review on September 23, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). Kilgore timely filed this action on November 20, 2025. (ECF Doc. 1).

## III. Evidence

### A. Personal, Educational, and Vocational Evidence

Kilgore was 35 years old on the alleged onset date, making him a younger individual according to Agency regulations. (*See* Tr. 249). He graduated from high school. (*See id.*). He has no past relevant work. (*Id.*).

### B. Relevant Medical Evidence[1]

Kilgore had an involuntary psychiatric hospitalization from June 26 through July 1, 2021, presenting after two weeks of mania with increased suicidal ideation. (Tr. 539). Notes reflect bipolar disorder with suicide precautions, including 15-minute checks; he was given Vraylar 6 mg each morning and Keppra 250 mg at night for mood stabilization, and Atarax 50 mg every 6 hours as needed for anxiety. (*Id.*). Kilgore's history included ADHD diagnosed at age 14, with later PTSD and anxiety diagnoses at age 28. (Tr. 550). On examination, Kilgore exhibited rapid, pressured speech; irritable mood; labile affect; agitated motor activity; impaired impulse control; poor insight; impaired judgment; and flight of ideas. (Tr. 551).

[1] Kilgore only raises error with the ALJ's consideration of his ADHD. (*See* ECF Doc. 10, pp. 13-17). I therefore summarize only those records related to this diagnosis and his mental health treatment. Any argument as to physical limitations is deemed waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). I also note that there were additional records submitted to the Appeals Council, including records from ARC Psychiatry. (*See* Tr. 8-165). Because these records were not before the ALJ, (*see* Tr. 261-62), I do not summarize them here.

Kilgore was voluntarily discharged on July 1, 2021 in stable condition. (Tr. 539). Discharge examination notes revealed cooperative demeanor, anxious mood, and flat affect; Kilgore was oriented in all spheres, with logical thought process, no delusions, or hallucinations, average insight, normal memory, and fair judgment. (Tr. 540). His diagnoses on discharge included bipolar disorder, severe with psychotic features; PTSD; ADHD; generalized anxiety; cannabis abuse; and other stimulant abuse in remission. (*Id.*). Discharge medications were Vraylar 6 mg daily, Depakote ER 1000 mg and Keppra 250 mg nightly for mood. (Tr. 541).

On February 4, 2022, Kilgore had a medication management visit with Nalini Morris, D.O.; he reported that discontinuing Adderall had helped somewhat with anger, and he wished to try non-controlled ADHD medications in the future. (Tr. 709-12). On examination, he had a depressed and anxious mood, no hallucinations, clear speech, and logical thought processes. (Tr. 710). Dr. Morris discontinued Adderall due to increased anger, continued him on Depakote, Intuniv, and hydroxyzine; and titrated Vraylar in favor of Abilify over the next four weeks, up to 15 mg Abilify. (Tr. 711). She also noted that Kilgore's treatment was "highly complicated due [to] severe symptoms difficulty stabilizing mood, and several medical and psychiatric comorbidities." (*Id.*). Dr. Morris recommended follow up in 8 weeks. (*Id.*).

On March 3, 2022, Kilgore met with Jessica Steinbach, LPC, and reported an increase in anger, mania, and depression; he presented as tearful, agitated, and depressed. (Tr. 706). He reported past suicidal ideation with no plan, intent, or means. (Tr. 707). Ms. Steinbach noted that he exhibited rapid cycling between angry, depressed, and euthymic. (Tr. 706). She explained that he was hyperfixated on ways he was a failure, became visibly angry, and began crying during the session. (Tr. 707).

On March 25, 2022, he met with Dr. Morris for medication management related to his diagnoses of traumatic brain injury, bipolar disorder, ADHD, cannabis abuse disorder, and post traumatic concussion syndrome; Kilgore reported that going off Adderall has helped some but he was still getting very angry. (Tr. 884). Dr. Morris continued the titration between discontinuing Vraylar and increasing Abilify, and recommended follow up in eight weeks. (Tr. 886).

On May 11, 2022, Kilgore met with Dr. Morris and reported being uncertain whether Strattera was helping but also stated he was functioning better. (Tr. 867). He had passive suicidal ideation without actual plan or intent. (*Id.*). On examination, his mental status was unremarkable, with euthymic mood and full affect. (Tr. 868). Dr. Morris discontinued Depakote due to weight gain; continued Strattera, Intuniv, and Hydroxyzine; and increased Abilify to 20 mg daily. (Tr. 869).

On July 5, 2022, Kilgore met with Dr. Morris for medication management. (Tr. 679). On examination, his mental status was unremarkable, with euthymic mood and full affect. (Tr. 680). Dr. Morris noted he was on the maximum dose of Abilify and doing better with a more stable mood; she started Mydayis 25 mg; discontinued Intuniv; continued Abilify at the same dose; and continued hydroxizine as needed. (Tr. 679, 681). Notes from his telehealth therapy visit with Jessica Steinbach, LPC, from this same day noted racing thoughts and pressured speech, and that he appeared manic during the session. (Tr. 851-52). Kilgore reported missing his previous therapy sessions because they were held in the basement and he would have panic attacks as a result; Ms. Steinbach offered to continue with telehealth sessions, and his mood became less defensive and angry. (Tr. 852).

On July 8, 2022, Kilgore reached out to Ms. Steinbach for an unscheduled therapy session after a domestic disturbance. (Tr. 676-77). During the session, he was depressed and

tearful with congruent affect. (*Id.*). On July 11, 2022 during a telehealth therapy visit with Ms. Steinbach, Kilgore reported better emotional regulation and coping skills; he stated he was working on not responding impulsively to his wife. (Tr. 845-46). He reported that his mood has been better since discontinuing Depakote and that he has more motivation to engage in daily tasks. (Tr. 846).

At a medication management appointment with Dr. Morris on September 12, 2022, Kilgore reported that he was doing well with his moods but requested an increase in Mydayis because he feels a "crash" when it wore off. (Tr. 633). He also reported getting a second opinion from another psychiatrist regarding his prior Depakote prescription; this psychiatrist confirmed that the course of treatment was appropriate. (*Id.*). Kilgore's mental status examination was unremarkable, with euthymic mood, full affect, clear speech, and logical thought process. (Tr. 634). Dr. Morris increased Mydayis to 37.5 mg each morning; continued Abilify; discontinued hydroxyzine; and started Ativan 0.5 mg as needed. (Tr. 635). Dr. Morris indicated that Kilgore's treatment was "moderately complicated due to comorbid psychiatric and medical conditions." (*Id.*).

On September 16, 2022, Kilgore met with Ms. Steinbach and reported an increase in anxiety and paranoia due to starting a new job and being in close quarters there and having related irrational and paranoid thoughts. (Tr. 630-31). On September 26, 2022, during a telehealth therapy visit with Ms. Steinbach, Kilgore reported using his coping skills and that his symptoms were manageable. (Tr. 627). Ms. Steinbach noted that he had rapid speech and that he was high risk for suicide because he had current thoughts of harm with plan. (*Id.*). Notes indicated that he was engaging in black and white thinking and was experiencing anxiety due to starting a new job that week. (Tr. 628).

At a medication management appointment on October 31, 2022, Kilgore reported that his moods were stable and that he was caring for his hygiene again, but the Mydayis wore off by 6:00 p.m. (Tr. 791). On examination, he exhibited an anxious mood with rapid, pressured speech; all other areas were within normal limits. (Tr. 792). Dr. Morris continued Abilify, Mydayis, and Ativan, and added Adderall 20 mg in the evening. (Tr. 793).

On November 14, 2022, Kilgore had a telehealth visit Ms. Steinbach, reporting increased depression and anger, and appeared tearful, agitated and depressed. (Tr. 619). During the session he began hyperventilating and stated he was calling from the parking lot of the crisis center (Tr. 620). Objectives for the session included identifying triggers for anger, improving distress tolerance and emotion regulation skills, and utilizing anger management skills to manage symptoms and return to baseline functioning. (*Id.*).

On November 22, 2022, Kilgore accessed crisis intervention services after experiencing a panic attack at work; he left during a break and went directly to the Coleman Crisis Center. (Tr. 732). He reported symptoms including anxiety, agitation, panic attacks, anger, and highly impulsive behavior. (Tr. 732, 735). He was able to deescalate during the session and was discharged with referrals to new psychiatric and counseling providers. (Tr. 732, 746). Diagnoses included bipolar disorder with anxious distress and mixed features, panic disorder, and ADHD, combined presentation. (Tr. 745). Symptoms included depressed feelings, anxiety, panic attacks, anger, impulsivity, inattentive behaviors, hyperactive behaviors, and mood swings, and caused impairment on his daily functioning and relationships at both home and work. (*Id.*).

Kilgore presented to Ms. Steinbach in crisis on December 6, 2022, and demonstrated a depressed mood with congruent affect, racing thoughts, and avoidant eye contact. (Tr. 616). He reported not going to work for the past month due to mental health concerns. (Tr. 617). On

December 18, 2022, he went to Coleman Crisis Center after having a breakdown with his mother. (Tr. 747). He was observed to have bloody knuckles and stated he had punched a door 30 times. (*Id.*). On mental status evaluation, he was noted to be tearful, unkempt with poor hygiene, preoccupied, and resistant with avoidant eye contact and perseverations. (Tr. 747, 759-60). He reported struggling with impulsiveness and being unable to control himself or his emotions because of his diagnosis. (Tr. 749, 761). His diagnoses were updated to include an unspecified personality disorder. (Tr. 760-61). He was stable by the end of the visit and was provided with short-term resources at Coleman to aid in the transition to long-term providers. (Tr. 762).

On December 22, 2022, Kilgore met with Dr. Morris for medication management. (Tr. 605). He reported that his moods were better since starting lithium, but he continued to have panic attacks and requested Dr. Morris complete FMLA forms. (*Id.*). Dr. Morris completed the FMLA form and continued all medications. (Tr. 606-07).

Kilgore underwent an initial diagnostic assessment with AVO Behavioral Health on January 10, 2023. (Tr. 1103-14). He reported experiencing 9/10 anxiety; daily panic attacks with pain in his chest related to being terrified of water or baths; mania; paranoid delusions; trouble maintaining focus; being easily distracted; and having aggression and anger issues involving punching doors but not harming others. (Tr. 1106). He noted that he quits or gets fired from every job, that he was on temporary leave from Spectrum, and that he has had 20 jobs in 20 years. (Tr. 1107). His mental status examination was unremarkable except for exhibiting low frustration tolerance. (Tr. 1108-10). He met the criteria for bipolar 1, PTSD, panic disorder, ADHD, and cannabis use disorder. (Tr. 1110). He was referred for individual counseling and medication management. (Tr. 1114).

On January 11, 2023, Kilgore underwent a psychiatric assessment with Lindsey Fascione, APRN, PMHNP-BC, noting conditions of bipolar disorder, ADHD, depression, anxiety, and panic disorder. (Tr. 1195-1206). He reported that he went off hydroxyzine, Ativan, and Prazosin, and that he was having two to three panic attacks per week. (Tr. 1195). He reported taking Mydayis 37.5 mg, Abilify 30 mg, and Adderall 20 mg daily, and lithium 150 mg twice daily. (Tr. 1196). On examination, he was restless, with an anxious and frustrated mood, congruent affect, appropriate speech, worried thought content, and disorganized, tangential thought process, distracted attention, impulsive behaviors, impaired judgment, and fair insight. (Tr. 1201-02). NP Fascione continued Kilgore on Mydayis, Adderall, Abilify, and lithium, as previously prescribed; added clonazepam 1 mg once daily as needed for panic attacks; and required lab work, with follow up in four weeks. (Tr. 1203).

Kilgore began attending regular individual therapy sessions with Veronica Gehring, LPC, starting on January 30, 2023. (Tr. 1065). He established goals of improving mood and sense of wellbeing; achieving a significant increase in compensatory skills for the management of ADHD symptoms; consistently regulating his emotional states; and understanding the dynamics of substance dependance and factors that could pose a risk to his sobriety. (*Id.*). His mental status examination was unremarkable. (*Id.*).

On February 8, 2023, Kilgore met with NP Fascione for medication management. (Tr. 1061-64). On examination, he had euthymic mood, congruent affect, intact judgment, and fair insight. (Tr. 1062). NP Fascione noted that Kilgore needed an adjustment in his lithium dosage but he had forgotten to get his lab work done. (Tr. 1064). She refilled clonazepam, aripiprazole, lithium, and Mydayis, and again ordered lab work. (*Id.*).

On February 13, 2023, Kilgore met with Veronica Gehring, LPC in a telehealth therapy session. (Tr. 1059). On examination, he presented with melancholic mood and congruent affect; all other areas were within normal limits. (*Id.*). His therapy goals included improvement in his mood and reduction of anxiety symptoms, as well as achieving a significant increase in compensatory skills for the management of his ADHD symptoms. (*Id.*). During the session, he reported having psychosis, extreme paranoia, and thoughts of hurting himself. (Tr. 1060).

On March 15, 2023, Kilgore met with NP Fascione for medication management. (Tr. 1051). Notes stated that Kilgore was stable on the medication regimen and no changes were necessary. (Tr. 1052). NP Fascione refilled all medications. (Tr. 1054).

Kilgore met with Ms. Gehring on April 24, 2023, and described being in a lot of pain from a construction job and having domestic issues with his wife. (Tr. 1046). On examination, he had melancholic mood and congruent affect, and reported suicidal thoughts without plan or intent. (Tr. 1045). Therafter Kilgore met regularly with Ms. Gehring via telehealth, including on May 8, June 7, July 5, 17, and 31, and August 21, 2023. (Tr. 1017-18, 1023-24, 1027-30, 1035-36, 1039-40, 1045-46). On examination, he generally exhibited melancholic mood with congruent affect but otherwise was within normal limits. (*Id.*).

On October 9, 2023, Kilgore met with NP Fascione. (Tr. 586). He had started electroconvulsive therapy ("ECT") and reported a beneficial reduction in racing thoughts. (Tr. 587). On examination, he had a melancholic and sad mood with congruent affect, intact judgment, and fair insight; all other areas were within normal limits. (*Id.*). NP Fascione reduced lithium to 300 mg twice daily per hospital request, and maintained all other medications. (Tr. 589).

On November 28, 2023, in a telehealth counseling session with Ms. Gehring, Kilgore reported decreased short-term memory. (Tr. 574). Examination results were otherwise generally within normal limits. (*Id.*). Goals addressed in the session included increasing compensatory skills for ADHD symptom management, such as developing strategies to decrease restlessness and self-monitoring and improving inattentiveness. (Tr. 575).

On December 6, 2023, Kilgore met with Erin Morabito, MSN, AGPCNP-BC, PMHNP-BC, for medication management. (Tr. 2067-69). He reported having discontinued lithium and ECT, but had plans to restart later that month. (Tr. 2068). NP Morabito observed marks from self-harm on his arms, but Kilgore denied suicidal or homicidal ideation multiple times; he created a safety plan while in session. (Tr. 2067-68). NP Morabito decreased lithium to 300 mg twice daily; continued buspirone 15 mg twice daily; aripiprazole 30 mg once daily; Klonopin 0.5 mg as needed; and Mydayis 37.5 mg once daily. (Tr. 2068). She declined adding more Adderall to counteract all-day THC use. (*Id.*).

On December 27, 2023, Kilgore presented for medication management, and reported restarting biweekly ECT treatments. (Tr. 2070-71; *see also* Tr. 1266-67). He was stable on his medications, presented as alert and oriented, and had not engaged in self-harm since restarting ECT. (*Id.*). NP Morabito decreased Mydayis to 37.5 mg daily, added adjunct Adderall 15 mg for the afternoon, discontinued buspirone, and continued Klonopin and lithium. (Tr. 2071-72).

On January 23, 2024, Kilgore met with NP Morabito for medication management. (Tr. 2080). He reported continuing with ECT treatments but had been unable to get his lithium levels checked, and his Mydayis was discontinued due to insurance issues. (Tr. 2081). He reported struggling with focus at 5:00 p.m. daily. (*Id.*). NP Morabito tapered Abilify to 10 mg and continued all other medications. (Tr. 2081-82).

On February 26, 2024, Kilgore attended a medication follow up appointment with Heather Mong, APN, PMHNP. (Tr. 2083). On examination, he exhibited circumstantial thought process at times but was otherwise within normal limits. (*Id.*). He reported taking half of his prescribed lithium dose, and questioning whether it was necessary; he also reported feeling fewer borderline personality symptoms after stopping the short acting Adderall. (Tr. 2084). He also reported manageable side effects from his ADHD medications. (*Id.*). NP Mong continued to taper Abilify and continued all other medications. (*Id.*).

On March 11, 2024, Kilgore met with NP Morabito for medication management; on examination, he was calm and euthymic, and within normal limits in all areas. (Tr. 2088). Kilgore reported wishing to stop the ECT treatments due to increased anxiety related to sedation and requested to stop lithium because he felt it was not effective. (Tr. 2089). He wished to try Spravato for his continued depression. (*Id.*). NP Morabito reduced lithium to 150 mg daily, prescribed Adderall 15 mg twice daily, continued Abilify and Klonopin, and added Spravato 56 mg. (Tr. 2090).

On June 17, 2024, Kilgore underwent a diagnostic assessment at Akron General Center for Behavioral Medicine to determine eligibility for intensive outpatient services ("IOP") (Tr. 1705-33). He reported having PTSD due to physical, sexual, and emotional abuse in childhood; having psychotic episodes with paranoia and auditory hallucinations; self-harm; severe mood swings with anger; disassociation; and suicidal ideation. (Tr. 1706). He reported self-harm by cutting, hitting his temple with his fist, or hitting his head against the wall; he had hit himself within the last seven days, and had last cut himself in April 2024. (Tr. 1711). Kilgore was admitted to the IOP and underwent an initial psychiatric assessment on June 25, 2024. (Tr. 1622-36). He reported having psychotic episodes related to his borderline personality disorder; PTSD

around claustrophobia and being naked and wet (he had only showered three times that year); depression and suicidal ideation since he was six years old; and that his untreated ADHD was debilitating. (Tr. 1622-23). He reported benefiting from ECT but having related memory issues; anxiety of 8/10; three panic attacks in the last two weeks, with one leading to psychosis; that he had last cut himself about six weeks ago; and having auditory hallucinations within the last month. (Tr. 1623). He was diagnosed with major depressive disorder, recurrent, severe; PTSD; generalized anxiety disorder; borderline personality disorder; ADHD; and daily cannabis use. (Tr. 1629).

Kilgore attended IOP group therapy sessions on June 27, July 1, 2, 3, and 8, 2024. (Tr. 1524-1612). During the July 3 session, he reported having more active suicidal ideation, including plan but without intent. (Tr. 1556-57). During the July 8 session, he arrived late and was emotionally dysregulated and crying, stating that he was in a physically unsafe situation at home. (Tr. 1541). He described that his wife had engaged in verbally and physically abusive behaviors and that he had slept in his car the night before. (Tr. 1541-42). He was provided with community resources and notified that further absences or late arrivals would result in discharge from the IOP program. (Tr. 1543).

On July 10, 2024, he presented to the Akron General emergency department for suicidal ideation with plan. (Tr. 1398-99). He was evaluated by the psychiatry triage team, who recommended admission; he was accepted to Generations under the care of Roseline Okon, M.D. (Tr. 1400). He was medically cleared and transferred to Generations Behavioral Health for inpatient psychiatric care, with safety checks initiated at 15-minute intervals. (Tr. 1400, 1836). During that admission, Kilgore reported that he was triggered by group therapy discussions of self-harm and called 911 before he acted on those thoughts. (Tr. 1808). During examination by

Dr. Okon on July 12, Kilgore was anxious and reported that he was seeking admission to a 24-hour stepdown unit, and did not wish to continue receiving inpatient psychiatric care at Generations. (Tr. 1809). He requested discharge so he could attend his scheduled IOP and ECT appointments. (*Id.*). Mental status examination noted irritable and demanding behavior; pressured, rapid speech; labile mood with congruent affect; tangential thought process; denied auditory or visual hallucinations, but appeared to be internally stimulated and paranoid; limited intellectual functioning, memory, insight, and judgment. (Tr. 1810). Dr. Okon assessed Kilgore with bipolar disorder, current episode manic with psychotic features; borderline personality disorder; PTSD; generalized anxiety disorder; and cannabis use. (*Id.*). Dr. Okon discontinued Remeron and added Vistaril 50 mg every six hours as needed. (*Id.*). Kilgore stabilized on this medication course without change and was discharged on July 15, 2026. (Tr. 1813-25).

On August 15, 2024, Kilgore met with Tristan Weber, APRN, CNP, for evaluation of treatment-resistant depression. (Tr. 1969). He reported a history of depression, anxiety, and ADHD, and that he had previously been misdiagnosed with bipolar disorder but had more recently been diagnosed with borderline personality disorder. (*Id.*). He reported experiencing depression and suicidal ideation since a young age, and that ECT treatments every two weeks had been the only treatment keeping suicidal ideation at bay; he also reported memory troubles related to that treatment. (*Id.*). His ADHD symptoms were not currently being treated; he reported they were debilitating and had "ruled his life" since he was 14. (Tr. 1969-70). He reported cognitive decline and loss of executive function due to the ECT treatments; impulsivity; lack of concentration; pressured talking; mood lability; emotional outbursts; paranoia; and auditory hallucinations. (Tr. 1970). On examination, he had dysphoric mood, circumstantial thought process at times, required frequent redirection, and exhibited somewhat eccentric

behavior, but was otherwise appropriate. (Tr. 1973, 1978). CNP Weber assessed Kilgore as having combined severe ADHD, borderline personality disorder, and atypical depression. (Tr. 1978). Kilgore met the criteria for treatment resistance because he continued to experience severe depression and emotional dysregulation even after ECT, psychotherapy, and multiple medication trials. (*Id.*). CNP Weber recommended that Kilgore continue taking Rexulti as prescribed by his psychiatrist and placed referrals for transcranial magnetic stimulation therapy ("TMS"). (Tr. 1978-79).

On August 22, 2024, Kilgore met with Lori Pittinger, M.D., for initial psychiatric evaluation. (Tr. 2147-59). He was distressed about the memory loss sustained under ECT and was transitioning to new providers at the Cleveland Clinic as a result. (Tr. 2147). He had planned to transition to the TMS clinic but was doing well on Rexulti and no longer met the criteria for admission. (*Id.*). Rexulti greatly reduced his suicidal thoughts and paranoid symptoms. (*Id.*). He reported having a lack of appetite, anhedonia, pressured speech, racing thoughts, frequent anxiety, obsessive thoughts, and irrational anger outbursts. (*Id.*). On examination, he had rapid speech; moderate depression, anxiety, and anger; severe anhedonia; circumstantial associations; and fair attention and concentration. (Tr. 2151-52). Dr. Pittinger diagnosed Kilgore with borderline personality disorder; major depression, recurrent, moderate; and attention deficit disorder, combined type. (Tr. 2152). She continued him on Rexulti 0.5 mg at bedtime and Mydayis 25 mg daily. (Tr. 2153).

On September 16, 2024, Kilgore followed up with Dr. Pittinger and reported that Mydayis was helpful for focus and concentration but requested to reduce the dosage because he also had jumpiness and a revved-up feeling from it. (Tr. 2130). Examination notes indicate mild depression, anxiety, and anhedonia; all other results were generally appropriate and within

normal limits. (Tr. 2130-31). Dr. Pittinger continued Rexulti, decreased Mydayis to 12.5 mg daily, and started Effexor XR 37.5 mg daily for one week and then increase to 75 mg daily thereafter. (Tr. 2131).

On October 2, 2024, Kilgore established care with Wesam Aleyadeh, M.D. (Tr. 2092-99). He had previously been referred to neurology for evaluation of traumatic brain injury ("TBI") secondary to ECT therapy and became agitated during the visit after he was informed that his function and performance were within expectation. (Tr. 2092). Dr. Aleyadeh noted that Kilgore could recall short- and long-term memories without evident impairment. (Tr. 2093). Kilgore self-reported that his depression and ADHD were generally well-controlled, but Dr. Aleyadeh noted that his PHQ-9 scores do not correlate with his reported clinical improvement. (*Id.*). Kilgore reported that he had no energy, concentration, or appetite changes, but he had increased agitation and other psychomotor disturbances. (*Id.*).

**C. Medical Opinion Evidence**

On September 19, 2023, at the initial level, state agency reviewing psychologist Stacia L. Hill, Ph.D., found Kilgore had the following medically determinable impairments: depressive, bipolar, and related disorders; ADHD; and substance addiction disorders (drugs). (Tr. 317). Dr. Hill affirmed a prior RFC from the ALJ decision dated April 8, 2020. (Tr. 317-19). That RFC found that Kilgore had:

> the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant may perform simple-to-complex tasks, but undertaken in a work setting free of high production rate pace [as is found in assembly line work], which setting is routine, in that it contemplates no more than occasional changes in workplace tasks or duties, which setting requires no more than occasional interaction with supervisors, no more than incidental, superficial [defined as precluding group, tandem or collaborative tasks, as well as tasks involving sales, arbitration, negotiation, conflict resolution, confrontation, the management of, direction of, or persuasion of, others] interaction

> with the public, and no more than occasional, superficial interaction with a small group of familiar co-workers.

(Tr. 319).

On December 20, 2023, at the reconsideration level, Raman Chahal, M.D., found that Kilgore had the following severe impairments: depressive, bipolar, and related disorders; ADHD; and substance addiction disorders (drugs); also added anxiety and obsessive-compulsive disorders and trauma and stressor related disorders. (Tr. 325). Because of the additional diagnoses, Dr. Chahal did not affirm the prior findings. (Tr. 329). Dr. Chahal opined that Kilgore could maintain concentration, persistence, and pace on routinized and repetitive moderately detailed, but not complex, tasks for two-hour periods, and on simple tasks for extended periods to complete a workday or workweek on a sustained basis; he can follow a routine schedule which does not require frequent changes within customary tolerances; he might do best in a work setting that does not require a rapid production pace to meet rigidly timed quotas; he can handle limited public contact and can respond briefly but appropriately to coworkers and supervisors, ask questions and request assistance as needed; he can adapt to basic and routine workplace changes, commensurate with his work; and he can adapt to a stable work routine that does not require frequent changes. (Tr. 328-29).

On March 12, 2024, CNP Morabiko completed a medical opinion questionnaire. (Tr. 1237-40). In it, CNP Morabiko noted diagnoses of bipolar disorder, ADHD, and depression; that he isolates at times but was stable, and that she believed he could work part-time without issue. (Tr. 1237). She noted that Kilgore's symptoms included anhedonia; thoughts of suicide; blunt, flat, or inappropriate affect; feelings of guilt or worthlessness; THC dependence; and a history of multiple physical symptoms affecting his life patterns. (Tr. 1238). In her opinion, Kilgore had moderate limitations in interacting with others but no other functional limitations. (Tr. 1239). He

would be absent about four days per month due to his impairments or treatment, and he could not manage his benefits in his own best interest. (Tr. 1239-40).

**D. Administrative Hearing Evidence**

On October 3, 2024, Kilgore testified at a hearing before the ALJ. (Tr. 262). He testified that he lives in a home with his spouse and their two children. (Tr. 264). Kilgore completed high school and completed four years of college credits but did not receive a degree due to a mental health crisis. (Tr. 265). He had last worked at a call center position with Charter/Spectrum for approximately three months in 2022, with about eight weeks of classroom training and two weeks on the floor before he left after a panic attack. (Tr. 268-69). He also worked as a manager trainee at Hardee's for a few weeks, but again left due to a panic attack after all other employees quit at the same time and he was left to run the restaurant by himself. (Tr. 271-72). The Hardee's job required him to lift and carry up to 50 pounds. (Tr. 282).

Kilgore testified to daily marijuana use, typically in evenings with multiple smoking sessions, and occasional morning use for panic; he estimated three to five joints per week. (Tr. 272-73). He testified that marijuana keeps him from dreaming; he would smoke at night to keep from having nightmares or flashbacks. (Tr. 274). He testified that providers attributed his anxiety to cannabis use, but he was unable to quit. (Tr. 273-74, 276-78). He described prior cocaine use in his early twenties but had not done any hard drugs since 2013. (Tr. 276).

Kilgore testified to multiple suicide attempts starting when he was 14 years old. (Tr. 274-75, 287). He also engaged in self-harm behaviors, such as cutting to relieve stress or with intent to commit suicide, punching himself in the temple, or punching a concrete wall. (Tr. 287). He described that he would engage in these behaviors before going in to work a construction job; he quit that job after he was unable to staunch the bleeding before getting to work. (Tr. 289). He

testified to having paranoia and auditory hallucinations that his providers described as quasi-psychosis. (Tr. 288). He often has anger episodes and has had protection orders filed against him. (Tr. 287-88).

He testified that he often avoided showering due to anxiety and fear around getting naked in the shower, and had only bathed four times that calendar year. (Tr. 285-86). He had difficulty with chores, and his mother would often do the dishes or laundry for his family. (Tr. 286-87).

Kilgore testified that he engaged in electroconvulsive therapy beginning with three sessions per week for four weeks, followed by treatments every two weeks for ten or eleven months, with the last treatment on August 1 of that year. (Tr. 289). The ECT would take away his suicidality for almost two weeks at a time, though intrusive thoughts and self-harm persisted. (Tr. 289-90). He stopped the ECT in July 2024 after a psychiatric hospitalization for suicidal thoughts following a triggering description of self-harm in a group therapy session. (Tr. 290). He was engaged in one-on-one DBT therapy. (Tr. 290). He previously tried terazosin for nightmares but discontinued it due to symptomatic hypotension preventing him from getting out of bed.

The VE classified Kilgore's prior work as a Customer Service Representative, DOT # 239.362-014, SVP 5, sedentary; and Management Trainee, Fast Food Service, DOT #189.167-018, SVP 6, light per the DOT but medium as performed. (Tr. 282-83). The ALJ found neither constituted past relevant work because he was not at either job long enough. (Tr. 283-84).

The ALJ then posed the following hypothetical to the VE: assume a person of Kilgore's age, education, and experience who can perform medium work but limited to understanding, remembering, and carrying out only simple instructions; with only occasional public, supervisor, or coworker interaction; and only occasional changes in the work setting. (Tr. 284). The VE identified Hospital Cleaner, DOT #323.687-010, medium, SVP 2, with 34,000 jobs in the

national economy; Industrial Cleaner, DOT #381.687-018, medium, SVP 2, with 23,000 jobs in the national economy; and Automobile Detailer, DOT #915.687-018, medium, SVP 2, with 36,000 jobs in the national economy. (*Id.*).

The VE also testified that typical employer tolerance allows up to ten percent off-task time excluding normal breaks; greater time off-task would be work preclusive. (Tr. 284-85). Employers will also tolerate one or two absences per month during a short probationary period, with up to six absences per year tolerable thereafter; one absence per month on an ongoing basis would be met with reprimand up to termination. (Tr. 285). In response to questioning by Kilgore's attorney, the VE testified that a limitation to no public contact and less-than-occasional contact with coworkers and supervisors such that the individual must work in isolation would be work preclusive. (Tr. 291-92).

## IV. The ALJ's Decision

1. Claimant meets the insured status requirements of the Act through December 31, 2023.

2. Claimant has not engaged in substantial gainful activity since December 7, 2022, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. Claimant has the following severe impairments: marijuana abuse, depression, anxiety, personality disorder, post-traumatic stress disorder (PTSD), and obesity [72/285] (20 CFR 404.1520(c) and 416.920(c)).

4. Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. Claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), but can understand, remember, and carry out only simple instructions; with only occasional public, or co-worker interaction; and only occasional changes in the work setting.

6. Claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. Claimant was born November 3, 1987 and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. Claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering his age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national economy that claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. Claimant has not been under a disability, as defined in the Act, from December 7, 2022, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 243-50).

## V. Law & Analysis[2]

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. pt. 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

[2] The regulations governing DIB claims are found in 20 C.F.R. § 404, et seq. and the regulations governing SSI claims are found in 20 C.F.R. § 416 et seq. Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I cite only to the relevant regulations in 20 C.F.R. § 404 et seq. unless there is a relevant difference in the regulations.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B. Standard of Review**

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision

. . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI. Discussion

Kilgore brings one issue for this Court's review: whether the ALJ's RFC finding lacks the support of substantial evidence because the ALJ failed to properly evaluate his mental impairments. (ECF Doc. 10, p. 1). Because Kilgore argues that the Step Two error caused further effect at later stages of the sequential evaluation, I take each argument in turn.

### A. Taken alone, any error at Step Two is harmless where the ALJ finds other severe impairments.

As Kilgore asserts, the ALJ ignored medical evidence from his providers and the opinions of the state agency reviewers in favor of educational records to find that his ADHD was not a severe impairment. (*Id.* at pp. 14-15 (*comparing* Tr. 165-223, 317, 325, 540, 714, 760-61, 1111-13, 1081-82, 1629, 1978, 2068 *with* Tr. 244)). This failure at Step Two to find his ADHD was non-severe was against the medical evidence available in the record and his subjective

symptom complaints and was not corrected at later stages of the decision. (ECF Doc. 1, pp. 15-17).

The Commissioner asserts that because the ALJ found other severe impairments at Step Two, included limitations related to Kilgore's mental health in the RFC, and described his reasoning for those findings, the ALJ appropriately followed the regulations. (ECF Doc. 13, pp. 13-15). As the Commissioner states, an ADHD diagnosis alone does not require the ALJ to find it a severe impairment, and, because the ALJ considered and explained the evidence supporting his RFC decision, no error occurred. (*Id.*).

The Commissioner is correct in stating that as long as the ALJ considers all severe and non-severe impairments later in the decision, he does not err by finding ADHD non-severe. At Step Two, the claimant has the burden to show that he has at least one "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii), (c). In this context, a "severe impairment" is a medical condition that has more than minimal effect on mental or physical function and is expected to last for 12 months or cause death. 20 C.F.R. §§ 404.1509, 404.1522. The Step Two analysis is a threshold inquiry "intended to 'screen out totally groundless claims.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)). If the claimant cannot show at least one "severe" impairment, he is not categorically disabled. 20 C.F.R. § 404.1520(c). If he does satisfy this minimal burden, the ALJ must consider all of his impairments – even ones that are not "severe" – at the remaining steps in the sequential evaluation. *Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p). As long as the ALJ considers all the claimant's impairments in the other steps, any Step Two error is harmless. *Id.* (citing *Maziarz v. Sec'y of Health Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

At Step Two, the ALJ stated:

> The prior ALJ deemed attention deficit hyperactivity disorder (ADHD) severe. I do not. Claimant is a high school graduate and went to college (Hearing Testimony). He was in school for applied mathematics and physics and completed five years before dropping out due to hypomanic symptoms ([Tr. 1894]). Claimant's educational history is not consistent with severe ADHD.

(Tr. 244). As described above, not finding an impairment to be severe does not automatically result in error, as long as the ALJ cites substantial evidence in support of the decision and considers the non-severe impairment at later steps in the evaluation. Because the ALJ found marijuana abuse, depression, anxiety, personality disorder, PTSD, and obesity to be severe impairments, (Tr. 243), reversible error does not result at Step Two.[3]

However, after reviewing the ALJ's decision, I find that the Step Two issue of not finding Kilgore's ADHD a severe impairment was not corrected at later stages of the sequential evaluation, leaving the ALJ's decision without the support of substantial evidence, as I discuss in more detail below.

**B. Kilgore has not sufficiently shown error at Step Three.**

Kilgore argues that the ALJ's analysis of his mental impairments at Step Three lacks the support of substantial evidence, because the ALJ failed to consider all the evidence in the record when conducting his Listings analysis. (ECF Doc. 10, pp. 15-16). The Commissioner contends that the ALJ did not err in his Listings analysis, and Kilgore's assertions otherwise require this Court to reweigh the evidence. (ECF Doc. 13, pp. 15-20).

At Step Three, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20

---

[3] Even so, however, I question whether the ALJ's lone citation to the record is sufficient to support a finding of non-severity where the state agency reviewers and the prior ALJ found ADHD to be a severe impairment, and where the record is replete with references to show that the effect of ADHD was more than minimal. (*Compare* Tr. 244, 1894 *with* Tr. 300, 317, 325, 540, 550, 745, 884, 1110, 1629).

C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers*, 582 F.3d at 653 ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). The ALJ is not required to "discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Id.*; *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x at 641-42). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F.

App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

The ALJ may have considered ADHD in his Listings analysis. The ALJ included Listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), and 12.11 (neurodevelopmental disorders) in his consideration. (Tr. 244). In the analysis of the criteria for these Listings, the ALJ states:

> In understanding, remembering or applying information, claimant has a mild limitation. At the hearing, claimant testified that he went to college for five years (Ex. B17F at 25). In his Function Report, claimant stated that he needed reminders to take medication and go to appointments. He was able to pay bills, count change, handle a savings account, and use a checkbook/money orders (Ex. B4E). Throughout the record, claimant's memory has been intact on mental status findings (Ex. B9F, B22F). The record is consistent with mild limitations in this area.
>
> . . .
>
> With regard to concentrating, persisting or maintaining pace, claimant has a moderate limitation. At the hearing, claimant did not testify to any limitations in this area (Hearing Testimony). In his Function Report, claimant stated that his hobbies included playing the guitar. He had problems completing tasks and concentrating. He could pay attention for 10-20 minutes. He did not finish what he started. He followed written instructions "pretty good." He did not follow spoken instructions well (Ex. B4E). Mental status findings generally show intact concentration (Ex. B25F). Claimant's low frustration tolerance and complaints of issues with attention and concentration are consistent with moderate limitations in this area. As for adapting or managing oneself, claimant has experienced a moderate limitation. At the hearing, claimant testified that he had two children, ages eight and three (Hearing Testimony). In his Function Report, claimant stated that he tried to help with his children but had angry outbursts. He does not bathe often and rarely got a haircut. He was able to make simple meals and sometimes vacuumed (Ex. B4E). Claimant's treatment providers at times noted that he was disheveled, but other times noted that he was well groomed and cooperative (Ex. B22F). The evidence is most consistent with moderate limitations in this area.

(Tr. 244-45). Although not stated, the analysis contained in this section may well include the ALJ's consideration of ADHD in his Listings analysis. Indeed, the ALJ describes functional

limitations that may relate to ADHD, such as low frustration tolerance, issues with attention and concentration, emotional outbursts, and reminders to take his medications. (*Id.*). At this stage, the burden rests with Kilgore to show that he definitively meets the criteria for a Listing. *See Smith-Johnson*, 579 F. App'x at 432. Kilgore has not met that burden, and I find no particular error at Step Three

**C. The ALJ's consideration of the medical evidence of record and Kilgore's subjective symptoms lacks the support of substantial evidence, causing error in the RFC analysis and later stages of the sequential evaluation.**

Kilgore also argues that the ALJ erred in his evaluation of the subjective and objective evidence, resulting in errors at Steps Two, Four, and Five of the sequential evaluation, and leaving his decision without the support of substantial evidence. (ECF Doc. 10, p. 14). As a result of the error at Step Two, the RFC did not accurately reflect Kilgore's limitations, and in the end, the ALJ's Step Five findings lacked support. (*Id.*).

The Commissioner does not directly address Kilgore's RFC arguments separately from the non-severity argument, but counters that the ALJ properly considered Kilgore's subjective complaints in accordance with SSR 16-3p. (ECF Doc. 13, pp. 20-24). In the Commissioner's view, Kilgore's request to reconsider his subjective complaints requires this Court to impermissibly insert its own judgment for that of the ALJ. (*Id.* at pp. 23-24)

Before proceeding to Step Four of the sequential analysis, the ALJ must assess the claimant's RFC. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 Fed. Reg. 34474, 34475 (1996)). An ALJ must consider all relevant evidence in the case record, including a claimant's severe and non-severe impairments. 20 C.F.R. § 404.1545(a)(2). Relevant evidence includes a claimant's

medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a).

The RFC determination "is an 'administrative finding,' and the final responsibility for determining an individual's RFC is reserved to the Commissioner." *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442 (6th Cir. 2017). And an ALJ does not err simply because her RFC finding is based on the objective medical evidence instead of a physician's opinion. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) ("[T]o require the ALJ to base [his] RFC finding on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." (quotation marks omitted)).

But when considering the claimant's RFC, the ALJ must provide "good reasons in the opinion—not an exhaustive factor-by-factor analysis." *Chicora v. Comm'r of Soc. Sec.*, 852 F. App'x 968, 971 (6th Cir. 2021) (internal quotations omitted). So long as the ALJ's RFC determination considered the entire record, the ALJ is permitted to make necessary decisions about which medical findings to credit and which to reject in determining the claimant's RFC. *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) ("The ALJ parsed the medical reports and made necessary decisions about which medical findings to credit, and which to reject. Contrary to [the claimant's] contention, the ALJ had the authority to make these determinations."). The "mere existence of a contrary opinion or piece of evidence in the record does not undermine the ALJ's notice of good reasons." *Chicora*, 852 F. App'x at 971 (internal quotations omitted).

However, an ALJ improperly "cherry-picks" evidence when his decision does not recognize a conflict between the functional limitations described in a medical opinion and the ALJ's RFC finding, and explain why he chose to credit one portion over another. *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 WL 1933405, at *13 (N.D. Ohio 2018) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination).

As a result, the ALJ must temper his duty to evaluate the medical and other evidence with the temptation to "play doctor" by substituting his own medical judgment for that of medical professionals. *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990); *accord Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006); *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 823-24 (N.D. Ohio 2009) ("[A]n ALJ 'does not have the expertise to make medical judgments.'"). An ALJ might cross this fine line when he: (1) rejects a medical opinion without relying on other evidence or authority in the record; (2) interprets *raw medical data* (*e.g.*, uninterpreted x-rays and lab results); or (3) applies a sit-and-squirm test to assess a claimant's limitations based on observations at the hearing. *See*, *e.g.*, *Weaver v. Sec'y of Health and Hum. Servs.*, 722 F.2d 310, 312 (6th Cir. 1983) (requiring an ALJ to cite evidence beyond personal observations); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record.").

And this is where I find the ALJ erred. The ALJ has the authority to make the RFC determination where the reasons given are supported by the record, and where the conflict in the

evidence is explained sufficiently for the claimant and a subsequent reviewer to follow. However, this non-severity finding, and the lone citation to the record, are in conflict with the body of the medical evidence available, and the ALJ does not sufficiently explain whether he incorporated any limitations in response to ADHD, or whether he found no limitations because of the non-severity finding. The regulations require that the ALJ considers "*all* impairments" when forming the RFC, "because a non-severe impairment may still contribute to a finding that a claimant is disabled." *Patterson v. Colvin*, No. 5:14 CV 1470, 2015 WL 5560121, at *4 (N.D. Ohio Sept. 21, 2015) (emphasis in original) (citing SSR 96-8p). The Agency's definition "contemplates that non-severe impairments may very well impose *some* type of limitation on basic work activities; accordingly, an ALJ's conclusion that an impairment is non-severe is not tantamount to a conclusion that the same impairment—either singly or in combination with a claimant's other impairments—does not impose *any* work related restrictions." *Id.* (emphasis in original) (quoting *Katona v. Comm'r of Soc. Sec.*, No. 14–CV–10417, 2015 WL 871617, at *6 (E.D.Mich. Feb.27, 2015) (citing 20 C.F.R. § 404.1521(a)). "Where an ALJ determines that non-severe impairments do not result in any work-related restrictions or limitations, the ALJ '*is required to state the basis for such conclusion*.'" *Id.* (emphasis added) (internal quotations omitted)

Here, the ALJ found ADHD to be non-severe, and cited one portion of a note during a psychiatric hospitalization[4] to find ADHD non-severe. (Tr. 244 (citing Tr. 1894)). In describing the RFC analysis, the only reference to whether the ALJ considered the impact of ADHD in the RFC is when he rejects the prior ALJ's RFC findings: "I do not adopt this residual functional

[4] That note includes a diagnostic history of "MDD, Bipolar II with BPC, Anxiety, and ADHD" and later states "Of note, pt went to college for applied mathematics and physics. He states that he completed 5 years of college and an engineering internship. He was very close to graduating but hypomanic sx prevented him from doing so." (Tr. 1894).

capacity due to changes in claimant's diagnoses. The prior ALJ did not consider claimant's severe obesity, including the diagnosis of obesity and PTSD. The prior ALJ considered ADHD severe and I do not as discussed above." (Tr. 248). This rejection of the prior RFC, in part because it included ADHD as a severe impairment where this ALJ does not, does not clarify the conflicts in the evidence sufficient for this Court to review.

Reading the decision more fully, the ALJ does not reference ADHD, nor whether the RFC included limitations in response to this impairment. (*See generally* Tr. 244-51). The ALJ's lone statement in the RFC analysis regarding ADHD – that he found it non-severe – does not explain whether the ALJ considered it when forming the RFC. And there is significant conflict in the record as to the severity of Kilgore's ADHD, such that some limitations might be necessary, even with a non-severity finding. As *Patterson* guides, an ALJ still has the responsibility to state the basis for concluding that no limitations are necessary – and the ALJ did not do so here.

As is clear in the record, State agency reviewers included ADHD as a severe impairment in their opinions. (Tr. 317, 325). The prior ALJ also considered ADHD a severe impairment. (Tr. 300). Kilgore's ADHD diagnosis was consistent throughout the record with all providers. (*E.g.*, Tr. 540, 550, 745, 884, 1110, 1629). Kilgore regularly took medication to improve his ADHD symptoms. (*E.g.*, Tr. 633, 635, 711). Even so, his providers had difficulty finding the right combination of medication that would treat his ADHD symptoms without exacerbating his other comorbidities. (*E.g.*, Tr. 884 (describing needing to reduce the Adderall prescription to prevent angry outbursts), Tr. 711 (discontinuing Adderall and noting that Kilgore's treatment was "highly complicated due [to] severe symptoms difficulty stabilizing mood, and several medical and psychiatric comorbidities."). He regularly sought therapy, which included working on building coping skills to relieve his ADHD symptoms. (*E.g.*, Tr. 1059, 1065). Kilgore at times

described his ADHD symptoms as "debilitating" or that he was controlled by this diagnosis. (Tr. 741, 761, 1622-23). This does not evidence a non-severe impairment that minimally impacts Kilgore's life.

This failure to articulate a full consideration of all severe and non-severe impairments, including ADHD, results in an RFC unsupported by substantial evidence.

Because the ALJ failed to articulate whether he considered ADHD when forming the RFC, particularly in light of the record evidence which describes functional impairments related to this diagnosis, the RFC does not have the support of substantial evidence.

**D. The error at Steps Two and Four cause the ALJ's findings at Step Five to lack the support of substantial evidence.**

Taking my decision at Step Four to its conclusion, the ALJ's Step Five analysis likewise fails.

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence as to whether the claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs. *Howard*, 276 F.3d at 238. A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC and other vocational characteristics. *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir.

2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations"). "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible." *Lee*, 529 F. App'x at 715; s*ee also Blacha v. Sec'y of Health Hum. Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.")

Where, as here, the RFC is unsupported, the ALJ cannot rely on the VE testimony resulting from an erroneous hypothetical.

I therefore vacate the final decision of the Commissioner and remand to the Agency for reconsideration. On remand, the Agency is directed to reconsider the effect of Kilgore's ADHD on his RFC and conduct further proceedings, including holding a hearing and obtaining VE testimony in response to an appropriate hypothetical RFC.

**VII. Conclusion**

Because the ALJ failed to reach a conclusion supported by substantial evidence, the Court vacates the Commissioner's final decision denying Kilgore's applications for DIB and SSI and remands his case to the Agency for further consideration.

Dated: October 13, 2026

Reuben J. Sheperd
United States Magistrate Judge